## WILLIAMSON *v.* GRIDER.

### Opinion delivered January 30, 1911.

1. WILLS—AUTHORITY OF EQUITY TO CONSTRUE.—Where a trust is created by will, equity has jurisdiction to construe the will if there is any doubtful question therein. (Page 607.)

2. SAME—AMBIGUITY—JURISDICTION OF EQUITY.—A will creating a trust to pay debts and providing that the trustee should manage the estate, without directing how it should be done, and providing that the trust should terminate when the debts were paid or the children of tes-

trix arrive at age, is sufficiently ambiguous to justify equity in assuming jurisdiction to construe the will. (Page 608.)

3. SAME—PROCEDURE TO CONSTRUE.—An application to the chancery court to construe a will should be by complaint and notice, and not by an *ex parte* petition of the trustees, in order that all parties interested may have notice. (Page 609.)

4. SAME—CONSTRUCTION.—Under a provision in a will impowering the trustees "to mortgage, sell or lease the lands" for the payment of the debts of the testator, there is no authority to mortgage crops, personal property, rents, etc., to secure advances to operate the plantation of the testator, or to conduct a general merchandise business, however advantageous these might be to the estate. (Page 609.)

5. SAME—CONSTRUCTION—JURISDICTION.—In a proceeding involving the construction of a will, it was error for the court virtually to assume the administration of the trust by its directions to the trustees, and by receiving and approving their accounts. (Page 609.)

6. TRUSTS—DUTY OF TRUSTEE TO ACCOUNT.—When a chancery court assumes to direct the execution of a trust estate, it should require the trustees to make a strict accounting of all the assets of the estate in their hands, showing receipts and disbursements. (Page 609.)

7. JUDGMENTS—CONCLUSIVENESS.—The fact that the beneficiaries of a trust acquiesced in a decision of the chancery court refusing to remove the trustees for inefficiency will not preclude them from subsequently asking that court to remove the trustees for a similar cause. (Page 610.)

8. TRUSTS—REMOVAL OF TRUSTEES.—It was not error for the chancery court to refuse to remove trustees who had been executing the trust in accordance with that court's directions. (Page 611.)

9. SAME—WHEN TRUST CEASES.—Under a will providing for a specific trust, and that the purposes of the trust shall be discharged and the estate in the trustees cease when the testator's debt shall have been paid, or when the beneficiaries shall have arrived at legal age, no distribution of the trust estate among the beneficiaries should be made until such debts shall be paid or the youngest beneficiary shall arrive at majority. (Page 611.)

10. ESTOPPEL—ACCEPTANCE OF BENEFIT.—One who accepts a benefit under a contract which he knows at the time to be unauthorized will be estopped to set up the invalidity of such contract. (Page 612.)

11. INFANCY—NECESSITY OF REPRESENTATION BY GUARDIAN.—A decree can not be rendered against an infant defendant until a guardian *ad litem* has been appointed for him and an answer has been filed by such guardian. (Page 613.)

Appeal from Mississippi Chancery Court, Osceola District; *Edward D. Robertson,* Chancellor; reversed in part.

Mrs. Sue M. Grider died April 13, 1901, testate. Her will was duly probated, and is as follows:

"Sans Souci, Miss. Co., Ark.

"March 13, 1886.

"I, Sue M. Grider, being of sound mind, make this my last will and testament. I bequeath to my beloved husband, W. H. Grider, and my dear mother, Georgia M. Erwin, my entire estate, both real and personal, of which I may die possessed, subject to the expense of my funeral and the debts I may owe, but this shall be in trust for the use and benefit of my child, Georgia Grider, and any other children that may be born after the writing of this will; they, my children, are to share equally my estate; and I desire that my said husband and mother shall be impowered to mortgage, sell, or lease the lands belonging to me and to apply the proceeds of such rents to the payment of my debts, and, should they deem it expedient to mortgage said lands for the purposes above mentioned, then their mortgage of same shall bind my children, and the lands are subject to said mortgage.

"I desire that my mother and husband act without bond and that the court of probate take no jurisdiction of my estate, as I feel confident that my said husband and mother will manage my estate for the best interest of my children.

"The purposes of the above trust shall have been discharged, and the estate in my said husband and mother shall cease, when my debts shall have been paid, or when my children shall have arrived at legal age. After all my debts have been paid, I will and bequeath to my mother, Georgia M. Erwin, and to her heirs forever, 160 acres of cleared lands, being the northwest quarter, section 18, township 12, range 11, or the northeast quarter section 21, township 12, range 11, as she may choose.

"I hereby appoint by mother, Georgia M. Erwin, and my husband, Wm. H. Grider, executrix and executor of my will, to act jointly, and in the case of the death of either the survivor to act alone.

"I hereby seal and sign this my last will and testament.

"Sue M. Grider."

The property consisted of 5,000 acres of land in Mississippi County, Arkansas, 2,000 of which was cleared and in cultivation.

There were mules, wagons and farming implements necessary
for the plantation. There were two stocks of merchandise worth
$4,700. There was also the home in Memphis, where the family
lived at the time of her death. The children are Mrs. Georgia Gor-
don Williamson, born in 1882; Mrs. Josephine G. Mitchell, born
in 1886; and John McGavock Grider, born May 28, 1892. The two
daughters, appellants, were of age when this suit was brought,
and the son, John McGavock, was a minor at the time
of the bringing of the suit and also at the time of the decree
herein. The property was incumbered by a mortgage to the
American Freehold & Mortgage Company for $26,000, payable
as follows: $5,000 January 1, 1902; $5,000 January 1, 1903;
$5,000 January 1, 1904; $5,000 January 1, 1905; and $6,000
January 1, 1906, all bearing interest at 8 per cent. per annum from
date until maturity and 10 per cent. thereafter until paid. The
Delta Cotton Company also held a mortgage covering advances
to be made during the year .1901, in the sum of $13,000. The
total indebtedness of the estate amounted to $37,976.36.

W. H. Grider had managed his wife's business from the time
of their marriage in 1880 till her death. He had cleared large
areas of land on the plantation, had built two gin houses, had
leased some of the lands, and was cultivating the residue by
share croppers. He was doing a general merchandise business
and furnishing tenants and croppers plantation supplies from
the stores. The money necessary to carry on this business had
been advanced from year to year by commission merchants, who
were secured by mortgages on the crops, wagons, mules, and
farming implements on the plantation. Upon the death of Mrs.
Grider, the trustees under the will took charge of the estate. It
appears that Mrs. Erwin was an elderly lady, and that the active
management of the trust devolved on W. H. Grider. Mrs. Erwin
simply acquiesced in what he did. The trustees construed the
will as giving them power to manage the estate of Mrs. Sue M.
Grider in the way it had been managed by W. H. Grider before
her death, and accordingly they continued to so manage it after
her death during the remainder of the year 1901, and obtained
large advances from the Delta Cotton Company, in addition to
the balance due it of an old indebtedness that had been advanced
prior to Mrs. Grider's death. These advances were made under

the mortgage that had been executed by Mrs. Grider to operate the plantation for the year 1901. But the trustees were unable to make the same arrangements for the year 1902, unless they could obtain from the chancery court a decision holding that they had authority to do so. Therefore at the March term, 1902, W. H. Grider filed a petition in the name of himself and Mrs. Erwin, his co-trustee, and Georgia D. Grider, also Josephine L. Grider and John McGavock Grider, by W. H. Grider, their next friend. After setting out the will, the petition alleged the manner in which the plantation had been operated theretofore, and then set forth that "the trustees would have difficulty in arranging for advances for the purpose of operating the plantation during the existence of the trust, *in the usual way that it had been operated,* unless it should be construed by the court that they had authority under the will to do so." The petition then continued as follows:

"That the said Sue M. Grider left no cash, and without advances the plantation can not be operated, and the beneficiaries under said will, although the owners of a valuable estate, will be without returns from it, and without means for their support and education unless they have relief in this court. Petitioners would also show to the court that, under the will of Sue M. Grider, deceased, no express provision is made for the maintenance and education of her children, nor any compensation to the trustees for handling the trust property, but petitioners submit that it was her manifest intention that *all* should be supported and sustained by said plantation until all of her children should be 21 years of age; that the control and management of the trust until then should be *plenary and supervised by no court;* that the annual income from said estate is from $8,000 to $15,000, and the real estate is incumbered by a mortgage placed thereon by the testatrix in her life time for the sum of $26,000, and that the property was further incumbered at her death by a mortgage for the year 1901 to secure further advances, which latter mortgage will be satisfied and paid by the crop of 1901, leaving the whole indebtedness of the testatrix practically the mortgage of $26,000.

"W. H. Grider and Georgia M. Erwin, as trustees, join in this petition for the purpose of placing themselves under such directions as the court will see proper to give in connection with

said trust estate, and especially with reference to the making of arrangements whereby the plantation may be furnished.

"The premises considered, petitioners pray a construction of said will, and that the trustees, or the survivor of them, be decreed to have power to annually mortgage or otherwise pledge the rents, shares, income, and profits of said plantation, mules and farming implements for the purpose of having it supplied; and petitioners pray for all proper relief."

The court, on the allegations of the petitions and the consideration of the provisions of the will, found as follows:

*"That the legal title to the estate of Sue M. Grider, deceased, by her last will and testament, passed to the trustees therein, namely, W. H. Grider and Georgia M. Erwin, to be held by them until the debts of said deceased should be paid or her youngest child should reach the age of twenty-one years, and that in the meantime the said trustees should manage and control said plantation and property as in their discretion they thought best;* and the court further finds that in the lifetime of the said Sue M. Grider the said plantation was successfully managed and controlled by her husband, Wm. H. Grider; that it was furnished annually by commission merchants, who were secured by a mortgage on stock, crops, and implements, and that it is necessary and expedient that it be operated in the same way for the year 1902."

The court then proceeded to render the following decree:

"It is thereupon considered, ordered, and decreed by the court that under said will the trustees *are charged with the duty of operating said plantation in the usual and customary way,* and to that end it is hereby decreed that they may legally mortgage or otherwise pledge the rents, share crops, and proceeds of landlord liens on crops made on said plantation for the year 1902, and the mules and farming implements now on said plantation, or that may be put there, to secure advances for the year 1902, *in such sums as the said trustees may think proper.* And petitioners will pay all costs of this proceeding."

Thereafter W. H. Grider, as the active trustee, continued to manage and operate the trust estate, submitting the manner of his management and the result of his operations to the chancery court in annual reports. The court accepted these reports, and

made further orders concerning the management of the estate. On June 1, 1904, the chancery court entered the following order:

"*In re* W. H. Grider and George M. Erwin, trustees of the estate of Sue M. Grider, deceased. Now on this day comes W. H. Grider, and files his annual report, and requests the court to appoint a master to go over all the reports and accounts filed by him, and pass the same.

"It is, therefore, considered and ordered that the said reports and accounts be, and they are hereby, referred to a special master, with directions to master to go over the same, and over the transactions of the said trustees during their administration of the trust, and of any other matter pertaining to the trust, which the said trustees may present to him, and make a full report of all such matters at the next term of this court.

"It is further ordered that S. S. Semmes, Esq., be, and is hereby, appointed special master, with direction and authority to carry out this order."

The beneficiaries under the will were not made parties to the proceeding to appoint a master, and they were not notified by the master of any proceedings taken by him under the appointment. On the 4th day of Oceober, 1904, the master made his report to the court, in which from an examination of the accounts, exhibits and other proof on file he finds the amount of the indebtedness of the estate at the time of Mrs. Grider's death as above mentioned. He shows how the estate has been managed, and finds that the floating indebtedness had been reduced from $11,-976.36 to $557.74. He sets forth the amount of the disbursements of the trustees and the amount of the income from all sources received by them, showing that disbursements exceeded the income in the sum of $393.39. After stating what had been done by the trustees toward paying the debts, leasing the lands, making improvements, etc., he concludes his report as follows:

"From all of which it appears quite probable that, with the present management, said estate will, after this year's operations, be in condition to enable the executors to realize from the earnings thereof, over and above current expenses— including liberal allowances to the devisees—a sufficient amount, annually, to be applied to the principal debt, so as to permit them to liquidate this indebtedness by the time the youngest child becomes of age; and

thus leave to the devisees, not only free from incumbrance and liabilities, but greatly enhanced in value, the large property bequeathed to them by their late mother."

The special master's findings are in fact based upon a report of W. H. Grider to the chancery court, in which he sets forth what he designates as a "brief history" of the management of the estate from the time of his marriage to the date of the report, September 20, 1904, also from the annual reports he had filed and the exhibits thereto, which were, for the most part, but the accounts of W. H. Grider with the merchants, showing the amounts they had advanced to and charged him with, which they paid out on his individual check or order and the amount of the proceeds of crops, etc., with which they had credited him. There was no itemized statement of account with the estate in which W. H. Grider charged himself as executor with all the money he had received as the gross income of the estate arising from rents, proceeds of crops, sale of land, timber, mules, and all other sources of income from the estate. Nor were there accompanying vouchers for the disbursements which he claimed and with which he had credited himself. This method of stating the account was not adopted by Grider, and was not required by the master in making up his reports, nor by the chancellor in passing on the annual reports of the executor and the report of the special master. On the contrary, the chancery court approved the report of the master in the following order, entered October 7, 1904:

"Upon reading said report, the affidavit of W. H. Grider and the statements and accounts submitted by the said W. H. Grider to the special master, it is considered and ordered that the said report be and the same is in all things approved. The special master is allowed the sum of $100 as compensation for his services herein, which the said trustees are directed to pay and to take credit for the same in their account, and the annual report of the trustees, W. H. Grider and Mrs. Georgia M. Erwin, filed at the March term, 1904, of this court, coming on for consideration, the court being well and sufficiently advised in the premises, it is considered and ordered that said report be and the same is in all things approved, and the said trustees are hereby directed and impowered to manage, control and administer the said trust estate in the same manner as heretofore, and to this end they are

hereby authorized and impowered to rent, lease or cultivate the lands, borrow money, mortgage the crops, and lands or either, hypothecate the rent notes, pay or extend debts, and carry on the merchandise store and business and operate the gin during the remainder of the present year, and during the year 1905."

In December, 1904, the two daughters, who were then of age, filed their complaint in the Mississippi Chancery Court, in which they set up in detail the manner in which W. H. Grider had administered the estate in his hands, basing their allegations upon the foregoing, and alleging further:

"That he had treated with silent contempt a demand made upon him by plaintiff, Georgia Williamson, for a statement showing what he had received and disbursed as trustee; that he not only managed the trust estate as if no one had any interest in it but himself, but that he was extravagant, loose and careless in his business methods, and that he was either acting *not in good faith toward the trust estate and plaintiffs*, or else lacked the necessary qualifications to manage it successfully; that in its management he acted in utter disregard of his obligations and duties as trustee, and was wholly wanting in a proper sense of his responsibility as such; that he owns no property in his own right, and is personally insolvent and without credit; that he is largely indebted to his trade creditors; that he owes $800 to B. Lowenstein & Bros. and $1,200 to W. B. Mallory & Co., besides numerous judgments against him and claims in the hands of attorneys for collection aggregating nearly $2,000, none of which are valid claims against the trust estate, but which he says he intends to pay 'at all hazards,' and *will pay out of the trust estate,* if permitted to remain longer in its control.

"That not only were his personal interests antagonistic to those of his *cestuis que trust,* but that such a state of mutual ill-feeling, growing out of his behaviour, exists between him and plaintiffs that his continuation in office would be detrimental to the execution of the trust."

They alleged "that he had abandoned the idea of paying off the mortgage debt with the rents realized on the Edrington lease, and, as stated in one of his affidavits, only hoped to wipe it out entirely by the time the youngest child became of age." They set up:

"That 10 per cent. interest was an exorbitant rate on a debt of $26,000, secured by a mortgage on property worth $200,000, with an annual income of twelve or fifteen thousand dollars. That a receiver, acting under the orders of the court, could obtain a new loan at a much lower rate, payable in annual installments, which could be easily met out of the income, and the beneficiaries at the same time comfortably supported; that for obvious reasons the defendant could not successfully conduct such a negotiation, but if he had sought the aid of the court for that purpose, instead of getting authority to go on in the same old way, in direct opposition to plaintiffs' wishes, this bill would probably never have been filed.

"That it would be a great wrong for the defendant to be permitted to keep plaintiffs out of their own for ten years longer, especially as both of them were of age and able and willing to pay off their proportion of the indebtedness of the trust estate so soon as they could obtain a partition of the lands and have the portion to which each is entitled allotted to her in severalty; that as to them the trust had ceased, and that subject to the mortgage debts they were entitled to a partition of said land."

The prayer of the complaint was "that the order construing the will, entered at the March term, 1902, and the proceedings and orders relating to the report of S. S. Semmes, special master, be set aside and for naught held. That the court would take charge of the estate and require Mr. Grider to file a true and correct inventory of the personal estate which had come into his hands as trustee under the will, and to account for same; that he be required to file accounts showing all moneys that had come into his hands and all disbursements made by him as trustee; that he be removed and Mrs. Erwin permitted to resign, and that suitable persons be appointed in their stead; that a receiver be immediately appointed to take charge of the trust estate pending the removal of the defendant trustees and the appointment of new ones in their places."

This complaint was dismissed at the March term, 1905, and appellants, Mrs. Wiliamson and Mrs. Mitchell, appealed, but the appeal was not prosecuted. W. H. Grider continued thereafter to manage the estate as he had done from the beginning, and made reports to the court. On the 7th day of March, 1906, Mrs.

Williamson and Mrs. Mitchell entered into a contract with Mr. Grider by which they agreed to convey to him for life 700 acres of land selected by himself embracing what was known as Grider's Station, including the store and gin, and more than 400 acres of the cleared land in and around the station. The consideration was an agreement on his part to pay to each of them $1,000 per annum during the continuation of the trust. On March 8, 1906, the trustees under the will, and Grider in his own right, gave a mortgage upon all the personal property of the estate, and also the lands in which Mr. Grider was to have a life estate to Wm. M. Ball & Company, to secure $6,000 borrowed money to be used in making a crop for the year 1906 on the lands of the estate of Sue M. Grider, and on the same day Wm. M. Ball & Company opened an account with W. H. Grider. Mrs. Williamson and Mrs. Mitchell, at the request of Wm. M. Ball & Company, joined in the execution of this mortgage for the purpose of waiving priority of payment to them of $2,000 out of the rents which they were to get out of the rents under the contract they had made with Grider, *supra*. Mr. Grider gave a draft on Wm. M. Ball & Company in favor of Mrs. Williamson and Mrs. Mitchell for $500 each. Wm. M. Ball & Company paid the draft and charged same to the personal account of W. H. Grider. Wm. M. Ball & Company continued to make advances to W. H. Grider from year to year, to enable him to carry on his farming operations. These advances were secured by mortgages executed by the trustees, in the manner they had been doing. The balance against the trustees each year on their accounts with Wm. M. Ball & Company was carried into the next year's account. At the end of the crop season of 1907 and 1908 there was a balance of some six or seven thousand dollars. On the 10th of March, 1908, Grider and Mrs. Erwin executed a mortgage to Wm. M. Ball & Company upon the crops and other personal property of the estate, to secure the last year's balance and for the advances to be made during the year 1908, amounting in the aggregate to $13,000. This was the last transaction of the trustees, under the will, in their management of the estate, before the bringing of this suit.

On the 19th of August, 1908, appellants brought this suit. In their complaint they set forth all the allegations of the complaint

of December, 1904. They then allege the dismissal of that complaint and their failure to prosecute an appeal from the judgment of dismissal, and aver "that the action of the court in dismissing their bill for want of equity seemed to confirm Mr. Grider in his opinion that he was accountable to no one, and that the way he managed the trust estate was nobody's business but his own." They then set out in detail the manner of the administration of W. H. Grider of the estate since their bill of December, 1904, was dismissed. They set up the contract they made with W. H. Grider in 1906 mentioned above, and allege that he had failed to comply with the contract, and had forfeited all rights thereunder. They set up the mortgages that the trustees had executed to Wm. M. Ball & Company referred to above. They conclude their complaint with the following allegations and prayer:

"That the rentals which Mr. Grider has received, or should have received, from the trust estate during the seven years he has been in the exclusive control of it, amount to at least $75,000, and, in addition to the rentals, he has sold property of the estate, real and personal, to the amount of $13,900, making a total of $88,900. That plaintiffs are utterly unable to say what Mr. Grider has done with this large sum of money, as he has never filed any accounts as trustee in this court, nor submitted to these plaintiffs any statements showing his receipts and disbursements for any one of these seven years, although they continued to call for such statements until they saw it was useless. That the estate still owes on the mortgage held by the Freehold Company over $20,000, and that the trustees owe Wm. M. Ball & Company some ten or twelve thousand dollars, if not more, on all of which indebtedness Mr. Grider is paying interest at the rate of 10 per cent. per annum.

"That what these plaintiffs have received from the trust estate since their mother's death amounts to a mere pittance, and that, unless the court interferes, they will get nothing at all.this year (1908) as, even if anything is made over and above expenses, it will be more than consumed by the large balance carried over from 1907 by Ball & Company and secured by said trust deed. * * * That from the very first his (Mr. Grider's) attitude has been that of owner of the property, instead of trustee operating the property for the benefit of those to whom it was

devised; that he has refused to render plaintiffs accounts of his receipts and disbursements as trustee, and that it offends him to be called on for them; that he has said on more than one occasion that he 'would wreck the estate rather than consent to have it divided.' That he is wholly lacking in the qualifications essential to the successful and profitable management of a large plantation, and that his farming and mercantile operations have resulted in great loss to the estate. That he has gone on from year to year utterly indifferent to the fact that the beneficial owners of the estate were deriving no income from it, and to the further fact that his failure to pay off the mortgage debt must result in serious loss to the estate. That plaintiffs are both married women of mature years, and that it is of the greatest importance to them that the trust estate should be in the hands of some competent person, who would manage it judiciously and economically. That Mrs. Erwin has had absolutely nothing to do with the administration of the trust, and is made a party defendant merely as the holder of the naked legal title to an undivided half of the trust estate. That they are advised that as to them the trust has ceased, and they are now entitled to have their interest in the trust estate set apart to them in severalty, but that they are willing to have it kept together and administered as a whole if the court will place some suitable and competent person in charge of the said estate to act as receiver pending this litigation. That, although plaintiffs regret greatly the mistakes and lack of judgment which have characterized the administration of the trust estate, they are willing to let bygones be bygones, and for that reason do not seek an accounting as against Mr. Grider, but they most earnestly insist that he is not a fit person to continue longer in the control and management of the trust estate.

"Plaintiffs pray that defendants Wm. M. Ball & Company be required to file true copies from their books of their itemized accounts against Mr. Grider for the years 1906, 1907 and 1908, and that a receiver be at once appointed to take charge of the estate; and that on final hearing a decree be granted plaintiffs setting aside and cancelling the contract made by them with Mr. Grider on March 6, 1906, and annulling their quitclaim deed held in escrow by Caldwell & Smith, of Memphis, Tenn., and set-

ting aside the several trust deeds executed by the trustees as to the lands embraced therein, and holding that the trust deed of March 10, 1908, is a valid security on the personal property embraced therein only for advances made for the farming operations of the year 1908, and removing Mr. Grider and Mrs. Erwin as trustees and appointing some suitable person trustee in their place and stead to administer the trust estate under the orders of the court. And for other and general relief."

By an amendment appellants asked that Grider be required to account since January 1, 1905.

The answer of W. H. Grider and Mrs. Erwin, without making specific denials of the various allegations of the complaint, set up that the will gave them plenary power to manage and control the estate, pay the debts and distribute the residue, when the "youngest child becomes of age." They set forth the condition of the estate when they took charge and its condition at the time of the answer; and briefly detailed what they had done and wished further to do, and concluded by asking the court to give them power to sell a half section of the land for $11,000, which they allege will enable them, with the discount of Edrington rent notes for 1909, and the proceeds of the Grider residence in Memphis, to "wipe out the mortgage debt." Grider answered individually that "he was perfectly willing for a decree to go cancelling the contract made with his daughters, and the deed they had put in escrow for him pursuant to the contract.

Ball & Company answered, claiming that the estate owed them a large balance, and that this money had gone into permanent improvements, and increased the income of the trust estate, and for that reason the estate was equitably bound for it, regardless of Mr. Grider's authority to contract the indebtedness, and prayed for a decree against the trustees, W. H. Grider and Georgia M. Erwin, and the estate of Sue M. Grider, deceased, for the amount found to be due, and that same be decreed to be lien upon the estate embraced in their trust deed, and that, in default of payment within a reasonable time, said real estate be sold, but, if the court should decree that they had no lien on the real estate, then that the trustees be required to pay the said amount out of the income of the estate, and that they were willing to take it in five equal installments out of said income, etc.

The chancellor in December, 1908, upon motion in vacation for the appointment of a receiver, denied the motion, but announced that the appellants "were entitled to the intervention of the court for their protection," and proceeded to make "such directions as the exigencies of the case required."

W. B. Mallory & Sons filed a petition asking to be made a party, and that the court direct the trustees to pay the sum of $495 due them on a note executed by W. H. Grider as trustee and executor in April, 1904; that the note was due February 1, 1905, and was for money and merchandise advanced to Grider in the cultivation of the plantation of Sue M. Grider, deceased. There was no answer to the intervention.

At the March term, 1909, the court, upon the pleadings and exhibits thereto and all the documentary and record evidence in the case and the depositions of W. H. Grider and W. M. Ball and the exhibits thereto, rendered the following decree:

"1. That the claim of W. B. Mallory & Sons Co., amounting to $497.20, is a valid · claim against the estate of Sue M. Grider, and directing the trustees to pay it 'out' of any fund which may come into their hands not otherwise appropriated by the court.'

"2. That the trustees were not authorized by any order of the court to contract the indebtedness due W. M. Ball & Company, but that such portion of said indebtedness as had been expended in permanent improvement upon the trust estate, or paid to the beneficiaries under the will, or paid for their benefit, or paid out by the trustees or Wm. M. Ball & Company on their orders in discharge of valid claims against the estate, constitutes a valid claim against the trust estate. And W. J. Driver is by the court appointed a special master to take proof in addition to that already in the record and ascertain and report to the court at its next term what portion of the claim of W. M. Ball & Company had been used for any of those purposes.

"3. That the contract of the plaintiffs with Grider, of March 6, 1906, and the deed made by plaintiffs in pursuance of said contract, were void, and the said contract and deed are hereby set aside, annulled and for naught held.

"4. But, the court being of the opinion that no sufficient cause was shown for the removal of said W. H. Grider and

Georgia M. Erwin, as trustees under the will of the date Sue M. Grider, it is therefore ordered and decreed that to that extent the relief sought by the said plaintiffs be and the same is hereby denied."

The decree also allowed a claim of Norton, Pratt & Co. for $135.81, and directed the trustees to pay same; also directed the trustees to pay one Montague the sum of $275 for his claim to a "certain accretion" in front of section 7, range 12, township 11.

The decree also contained certain other orders and directions to the trustees, not necessary to set forth.

The special master, upon testimony taken by him and certain reports, which were by agreement submitted to him, found that W. M. Ball & Company had advanced to the trustees, which had been paid to appellants, Mrs. Williamson and Mrs. Mitchell, $2,055, and for John McGavock, $3,136.55, for the years 1905-8, and taxes for those years, amounting to $437.35, and for improvements and other expenses $4,395.14, aggregating the sum of $10,024.04, which with the interest amounted to $11,916.22.

Exceptions were filed by appellants to the report. The court, in its final decree on this report, found:

"That by reason of the money furnished the estate by W. M. Ball & Company for the four years from 1905 to 1908, inclusive, to enable the trustees to operate the plantation, said property had greatly enhanced in value, and the rental value thereof greatly increased; and found that the estate of Sue M. Grider was indebted to W. M. Ball & Company in the sum of $6,191.46 on account of money advanced during said four years above mentioned and expended and used by said trustees in the operation and improvement of said Sue M. Grider estate, and for the payment of valid debts against it and to said benficiaries, and for their benefit, and found that said sum was a just and valid claim, and that same should be paid from the rents and profits from Sue M. Grider estate;" and rendered a decree for that sum.

The court further found that, since there were no funds in the hands of the trustees for the payment of said amount, it should be divided into five annual payments, and the said trustees were directed to execute and deliver to W. M. Ball & Company their five promissory notes in the sum of $1,238.29 each, of date

October 1, 1909, and due January 1, 1910, 1911, 1912, 1913 and 1914, with 6 per cent. interest.

An attorney *ad litem* was appointed for the minor, but no guardian *ad litem* was appointed to defend for him, and no answer was filed for him.

*J. H. Watson,* for appellants.

1. It was improper for the chancery court to construe the will upon an *ex parte* petition of the executor in which the children of the testatrix were joined as petitioners, and showing on its face the minority of some of the parties in interest. Where there are grave doubts, a trustee may file a bill in chancery and have the will construed; but in such case all parties interested or claiming under the will should be made parties *defendant.* Gibson's Suit in Ch. (2 ed.) § 42, subsec. 5, § 890; 22 Enc. Pl. & Pr. 1203; 16 *Id.* 506; 54 N. J. Eq. 591; 125 Mass. 541; 51 Mich. 623; 1 Barb. Ch. (N. Y.) 565; 88 Ark. 1, 5.

A court will refuse to entertain a suit for the construction of a will which is free from ambiguity. 22 Enc. Pl. & Pr. 1196; *Id.* 63, 64. It is only when there is a reasonable doubt or question that a trustee is entitled to come into a court of equity to have that question determined. 56 Md. 300; 61 Md. 457; 19 Mo. 403; 54 N. H. 444; 17 N. J. Eq. 153; 43 Hun (N. Y.) 600; 25 Beav. 139; 73 Cal. 560.

The trust created by the will was simply a trust for the payment of debts. The trustees were impowered to *lease, mortgage or sell* the lands belonging to Mrs. Grider for that purpose; but that the trustees should undertake to pay the debts by operating the plantation themselves "in the usual and customary way," or in any other way, was certainly not in contemplation of the testratrix. Authority in an executor or trustee to carry on the testatrix's business, even in the usual and customary way, must be expressly given, or it is not given at all. 18 Cyc. 243, note 7; 27 Ark. 126.

By the terms of the will the trust was to cease, whether the debts were paid or not, "when her children shall have arrived at legal age," and the court erred in construing this clause to mean when the youngest child reached the age of 21 years. 90 Ark. 155; 106 Mass. 106-112.

The court erred also in not requiring the executor to keep strict and accurate accounts of the trust property. Underhill on Trusts, 332; 2 Perry on Trusts, § 821; 35 N. J. Eq. 64; 28 Am. & Eng. of L. 1095, 1079, 1089.

A court of equity has power to remove a trustee for cause shown, independently of statutes or of directions in the instrument appointing him. 3 Ala. 477; 8 Ind. App. 27; 9 N. Y. 176; 41 N. Y. 117; 70 Wis. 518. And it will do so when his acts or omissions show a want of fidelity, or he mismanages the estate, etc. 9 Mod. 357; 5 Ves. 707; *Id.* 722; 6 Ves. 656; 1 Madd. 92; 5 Madd. 450; 2 B. Mon. 161; 7 *Id.* 171; 63 Md. 267; 1 Allen (Mass.) 354; 101 Mass. 223; 118 Mass. 251; 23 N. J. Eq. 192; 2 Barb. (N. Y.) 446; 58 Hun (N. Y.) 443; 36 Hun 122; 103 N. Y. 678; 20 Pa. 67; 103 Pa. 522; 96 U. S. 419; 2 Daniell's Pl. & Pr. 1721-1723; 17 Fed. 760; 111 U. S. 327; 106 Mo. 670; 145 Mass. 490; 167 U. S. 310.

A trustees is bound to account at all reasonable times; and if he fails to keep proper accounts, every presumption is held against him. 3 Wis. 367; 32 Pa. St. 495; 2 Woods 483; 35 N. J. Eq. 60; *Id.* 348; 2 Perry on Trusts, § 821; 7 Fed. 525. He can not, under the guise of repairs, undertake permanent improvements. 2 Edw. Ch. 231; 65 Ark. 581; 2 Perry on Trusts, § § 526-606; Beach on Trusts, § 455. He can not, in the absence of express authority, employ trust funds in business or trade. 17 Ala. 306; 42 Ala. 248; 1 Edw. (N. Y.) 206; 40 N. Y. 76; 20 N. Y. 437; 28 O. St. 231; 1 Conn. 307; 8 Conn. 458; 11 La. Ann. 472; 15 Md. 73.

2. The court erred in overruling plaintiff's exceptions to the master's report and adjudging the claim of Ball & Company for an alleged balance of $6,191.48 to be a just and valid claim against the estate of Sue M. Grider. That claim was only a personal one against the trustee, Grider, and their rights, even if this balance represents money borrowed from them and expended for the benefit of the estate, are to be subrogated to his rights as against the trust estate, if, on a settlement of his accounts as executor, it appears that the estate is indebted to him by reason of such expenditures. Their equity must be worked out through him, and not by a direct proceeding

against the estate.   19 Ala. 672; 44 Ala. 690; 64 Ala. 438, 451;
53 Miss. 466, 471.

*W. J. Lamb,* for W. M. Ball & Company.

When the court construed the will and assumed the admin-
istration of the estate, it immediately became incumbent upon the
trustees to manage the estate according to their judgment and to
report to the court.   The decree by the court that "under said
will the trustees are charged with the duty of operating said
plantation in the usual and customary way" was in itself a specific
direction to the trustees to furnish tenants, make contracts for
supplies and money to enable them to make the crop, and any
contract so made would be binding upon the estate.

A trustee is capable of exercising the discretionary powers
of the *bona fide* proprietor under particular circumstances, even
where no such authority is given by the instrument creating the
trust, as otherwise the trust estate might be injuriously affected.
28 Am. & Eng. Enc. of L. 982.   He may make such permanent
improvements as are necessary for the enjoyment of the trust
estate, and such as the court would sanction if application had been
made for permission to invest the income therein. *Id.* 983; 51
S. C. 506.   Where given power to exercise control or acts of
ownership over the real estate of a trust estate, he is not bound
to rent it to others, but may cultivate it for the benefit of the *cestui
que trust.*   15 Md. 73; 31 Md. 240.

The power given by the testratrix to the executors to mort-
gage, sell or lease the lands and apply the proceeds to the pay-
ment of the debt conferred upon the trustees by implication
power to do that which was necessary for the preservation of the
*corpus* of the estate and also the payment of debts.   28 Am. &
Eng. Enc. of L. 983.   And he need not procure a separate order
for each transaction. *Id.* 982; 91 N. W. 713, 715.

If it be conceded that the trustee would be personally liable
to Ball & Company, if the money was expended for the benefit of
the estate, the creditor might, if the trustee was solvent, first
compel him to pay, but in that case the trustee could enforce his
claim against the estate.   54 Miss. 467; 19 Am. St. Rep. 71.   And
where he is insolvent, as in this case, the demand will be enforced
directly out of the rents of the estate.   42 Pac. 971; 82 Ga. 177;
14 Am. St. Rep. 147.

Even if the court had made no order directing the executors to manage the estate in the way it has been done, still the estate would be liable in equity, and appellants are estopped to deny the validity of the claim.

*Charles T. Coleman,* for appellee, Grider, argued the case orally.

WOOD, J. First. When a trust is created by a will, a court of equity has jurisdiction to construe the will. This power is incident to the jurisdiction which courts of chancery have over trusts. *Frank* v. *Frank,* 88 Ark. 5, and cases there cited; 22 Enc. Pl. & Pr. 60, 61 and 62 and numerous cases cited in notes.

As early as 1842 this court held that "as chancery will compel the performance of trusts, so it will assist the trustees and protect them in the due performance of the trust, whenever they seek the aid and direction of the court as to its establishment, management and execution." Ex parte *Conway,* 4 Ark. 302.

In *Dimmock* v. *Bixby,* 20 Pick. (Mass.) 374, it is said: "Whenever a trustee doubts as to his safety and security in complying with any claim of a *cestui que trust* or doubts as to any other matter arising in the execution of his trust, his only prudent and safe course is to wait for the directions of a court of equity. The common course in such cases is for the trustee to decline acting without such a sanction, leaving the *cestui que trust* to bring his bill to compel the execution of the trust. But it does not seem to be material whether the trustee be a plaintiff or defendant in the suit, the object of the application to the court being in either case the same."

"There are few cases of doubt in which the trustees may not properly decline to act without direction of the court." 22 Enc. Pl. & Pr. 63. The will under consideration created an express trust for the payment of debts. The trustees were given unlimited discretion to "mortgage, sell, or lease" the lands for that purpose. The trust ended when the debts were paid; but if not paid before the children of the testatrix arrived at legal age, the trust terminated then any way.

The estate at the time of Mrs. Grider's death owed about $38,000. Some of this indebtedness was not due until January 1, 1906, and could not have been paid without the consent of the creditor before that time. Debts could not be paid by simply

mortgaging the estate. For mortgaging to pay some debts would only be creating other debts to pay. It would require an income from other sources to satisfy the mortgage.

The testatrix evidently meant that, if her mother and husband deemed it to the best interest of her children, they could mortgage *the lands* of her estate to secure the debts until they could be paid out of the income derived from leasing or selling the lands. The whole will shows that the testatrix contemplated that it would take some time for the trustees to pay her debts, and that these might not be paid until her children had arrived at legal age. But the will was silent as to how the trustees should or might manage the estate during the time that would be required to sell the lands or to mortgage and lease same. The will, too, is silent as to whether the purposes of the trust should end when any of the beneficiaries were of age, even though the debts were still unpaid. It was a matter of doubt, and a question for construction, as to whether the testatrix intended to postpone the distribution of the estate among the beneficiaries until they all became of age.

A trustee is only entitled to come into a court of equity to have a construction of the will upon some doubtful question. 22 Enc. Pl. & Pr. 64; *Heald* v. *Heald,* 56 Md. 300; *Woods* v. *Fuller,* 61 Md. 457; *Hayden* v. *Marmaduke,* 19 Mo. 403; *Methodist Episcopal Society* v. *Harriman,* 54 N. H. 444; *Vanness* v. *Jacobus,* 17 N. J. Eq. 153; *Matter of Brewster,* 43 Hun (N. Y.) 600; *Merlin* v. *Blagrave,* 25 Beav. 139.

But there was sufficient ambiguity about the will in the above particulars to justify the trustees in asking a court of equity to construe the will concerning them. The court, however, should have declined to entertain jurisdiction of the *ex parte* petition of the trustees. For the court could readily see from the petition that the trustees were seeking a construction of the will that would enable them to "annually mortgage the rents, shares, income, and profits of the plantation, mules and farming implements for the purpose of operating it in the usual and customary way." This is the construction the court gave the will. Under this construction the trustees could postpone the payment of the debts until the youngest child became of age. Indeed, by devoting the entire income of the estate to expenses of operating the

plantation in the "usual and customary way," the payment of the mortgage debt that existed at the time of Mrs. Grider's death has been postponed almost till the youngest child shall have become of age. Therefore the rights and interests of the beneficiaries were affected by the construction which the trustees sought and which the court granted. They were entitled to a hearing in their own right. The application for construction of a will must be by bill of complaint, and not by petition, in order that all parties interested may have notice. 22 Enc. Pl. & Pr. 64, 1203; *Gibbins* v. *Shepard,* 125 Mass. 541; *Ledyard's Appeal,* 51 Mich. 623; *Matter of Van Wyck,* 1 Barb. Ch. (N. Y.) 565, and other cases cited in note.

The court erred in taking jurisdiction of the administration of the estate for the purpose of construing the will and in giving directions to the trustees upon their *ex parte* petition, and also erred in its construction of the will. For, as we have shown, there was no authority to the trustees to operate the plantation in the usual way. There is no authority to mortgage crops and personal property, rents, etc., for securing advances to operate the plantation. The only power given to them is "to mortgage, sell or lease the lands" for the payment of debts. Such debts as the trustees might have to incur in order to lease the lands to the best advantage would be included by necessary implication in the power to lease. But there is no language of the will that can be construed as giving the testamentary trustees power to carry on general farming operations and a general merchandise and supply business, no matter how advantageous or profitable these might be to the estate. The court not only erred in giving this construction to the will, but further erred in virtually assuming the administration of the estate by its orders and directions to the trustees and in receiving and approving annual reports of their management. The court, having assumed such jurisdiction, further erred in not requiring of the trustees a strict accounting of all the assets of the estate in their hands showing the disbursements with vouchers therefor, and the amounts received from all sources. For "a trustee must keep clear and accurate accounts of the trust property." Underhill on Trusts, p. 332; Perry on Trusts, 821; 28 Am. & Eng. Enc. L. 1095, and note.

But, however egregious the above errors of the court and

however great the mistakes of the trustees, these errors and mistakes can not be corrected by this appeal. For McGavock, the minor, was a necessary party to this proceeding for accounting, and he was not brought into court. Moreover, counsel for appellants, in his oral argument, expressly abandoned the prayer of his amended complaint for an accounting.

Second. All the proceedings of the chancery court in the matter of the construction of the will and of the administration of the estate, under the will, and all the acts of the trustees pertaining to such administration are, however, relevant to the question whether or not the court erred in refusing to remove W. H. Grider from the position of trustee. In this connection it was proper for the appellants to aver and set forth in their complaint all the acts of W. H. Grider in connection with his management of the trust estate from the beginning. Notwithstanding appellants brought suit, soon after reaching their majority, to remove the trustee, which, upon adverse decision, they failed to prosecute, still they are not estopped by that decision from setting up the same matter in this complaint together with the subsequent conduct of the trustee as alleged grounds for his dismissal. While the bringing of that suit and the failure to prosecute after dismissal was an apparent acquiescence on the part of appellants that there had been nothing in the conduct of W. H. Grider calling for his dismissal, yet that decision was not *res judicata* of the issue in this case as to whether or not W. H. Grider should now be removed. To determine whether he had been a competent and faithful trustee, his conduct as such from the beginning of the trust was in review, and the court did not err in refusing to strike the allegations of the former complaint from the complaint in the instant case. We have, therefore, with the aid of the exhaustive brief of the learned counsel for appellants, considered all the allegations of the complaint and all the evidence adduced as to the alleged delinquencies of W. H. Grider, and we do not discover any evidence of inability or unfaithfulness on his part as executor of the estate. Being doubtful what course he should pursue in the performance of his duties, he, almost from the beginning of his trust, brought the will into court and sought the court's direction and supervision. This act itself is the highest evidence of good faith. He construed the

will as not requiring a strict accounting to any court of the amounts received and disbursed by him in the management of the estate. He conceived that it was his duty under the will to operate the plantation after Mrs. Grider's death just as he had been doing before. He conceived it to be his duty to pay the debts, if it could be done in this manner, by the time the youngest child was of age. This was a total, but honest, misapprehension of the purport of the will.

The learned chancellor coincided with W. H. Grider in his construction of the will, and directed him to continue to so manage the estate, and approved the reports made from year to year of such management. Therefore the conduct of Grider in his management of the estate and in his manner of accounting must be viewed in the light of the direction and approval of his course by the chancery court. The conduct of Grider was, in a sense, thus caused by the court to which he appealed for guidance.

From the viewpoint which Grider and the chancery court had of the purport of the will, it certainly can not be said that Mr. Grider's management of the estate has been incompetent or unfaithful. But, on the contrary, it shows him to have been both conscientious and efficient. For the record shows that, under the construction that he and the chancery court gave the will, his management has been eminently successful, resulting in great enhancement of the estate to the consequent benefit of the beneficiaries. Although such management was contrary to the rights of appellants under the provisions of the will, as we construe it, yet such management can not be set down as an impeachment of his competency or fidelity as a trustee.

If the court had removed him, it would have been virtually a condemnation of its own agent for doing the things it had at first directed and approved. Such treatment of the trustee was neither deserved nor necessary, for the court at the time of its judgment had then taken charge of the estate for the protection of the beneficiaries, and could thereafter control the conduct of the trustee Grider. The court did not err in refusing to remove W. H. Grider from the trusteeship.

Third. It was the intention of the testratrix that there should be no distribution of the estate among the beneficiaries until her debts were paid, and that, unless her debts were paid

before the youngest child became of age, the estate should not be divided or partitioned among the beneficiaries till the majority of the youngest child. The record shows that the debts have not been paid, and therefore appellants can not maintain this suit as for partition.

Fourth. As to the judgment in favor of Ball & Company, the evidence shows that in 1906 appellants at the request of Ball & Company joined in a mortgage that was executed by the trustees for advances during that year. The appellants accepted money that was advanced to the trustees under this mortgage, and that was paid to them by the trustees through drafts on Ball & Company. Likewise the appellants received money for other subsequent years that they must have known was advanced to the trustees by Ball & Company, and secured by mortgage executed to Ball & Company by the trustees. The report of the special master shows that during the years 1905, 1906, 1907 and 1908 appellants received in person from the trustees the sum of $2,055. There was evidence to warrant the conclusion that appellants knew that this money was obtained by the trustees from Ball & Company. The evidence also warranted the conclusion that appellants knew that the balance of the amount of the judgment was expended by the trustees for the betterment of the estate, and they acquiesced therein. They should not deny it now. Appellants, having received a portion of the money derived from the contracts thus made by the trustees with Ball & Company and having acquiesced in the expenditure of the balance for their benefit, are now estopped from setting up that those contracts are invalid.

One can not receive or accept a benefit under a contract which he knows at the time was unauthorized, and then set up the invalidity of the contract. Grider was insolvent. Therefore the pro rata interest of appellants in the estate may be subjected in equity to the payment pro rata of the judgment of Wm. M. Ball & Company. *Norton* v. *Phelps*, 54 Miss. 467; *Clopton* v. *Gholson*, 53 Miss. 466; *Norton* v. *Phelps*, 103 U. S. 393.

As to the judgments in favor of other parties disclosed by the record, it suffices to say that they have not been made parties to this appeal.

The judgment refusing to dismiss W. H. Grider from the

trusteeship, and the judgment in favor of Ball & Company as to the appellant is affirmed. In so far as the judgment in favor of Ball & Company affects the interest of McGavock Grider, the minor, the same is reversed and remanded, for the reason that no guardian *ad litem* was appointed for him, and no answer has been filed by any guardian for him. Section 6023, Kirby's Digest; *Cowling* v. *Hill,* 69 Ark. 350; *Freeman* v. *Russell,* 40 Ark. 56. The cause will be reversed with directions for further proceedings not inconsistent with this opinion.