MACK, EXECUTOR, *v.* RITTENHOUSE.

4-7108                                   173 S. W. 2d 1002

Opinion delivered June 28, 1943.

*E. G. Ward,* for appellant.

*T. A. French,* for appellee.

GRIFFIN SMITH, Chief Justice.   In March, 1942, Lottie Earle, realizing the certainty of death, directed in an appropriately executed will, that her son, Herman Rittenhouse, have the annual rental income from her real estate, in monthly payments "after necessary expense is taken out for upkeep, taxes, insurance, etc."

To persons, institutions, and for a personal purpose expressed in the fifth item, sums aggregating $7,400 were bequeathed, inclusive of an "additional" $500 for legal services incident to closing the estate. The eighth section designated G. F. Mack and O. T. Ward executors "to carry out the directions contained herein, and as directed by the court." The second, third, fourth, fifth, sixth, and seventh sections are copied in the margin.[1]

---

[1] [Second Section]:   I will that my son, Herman Rittenhouse, have the annual income from rentals of my real estate and business houses, in monthly payments, after the necessary expense is taken out for upkeep, taxes, insurance, etc.

[Third Section]:   I hereby give and bequeath the following amounts to the following persons and institutions, if the persons are still living at the time of my death, and if the institutions are in existence at the time of my death:   To the Missionary Society of the First Methodist Church, Rector, Arkansas, $500; the First Baptist Church, Rector, Arkansas, $500; to Pansy Wright and her mother, Lina Wright, to be divided equally, $500; to Geneva Wright, $200; to O. T. Ward, for legal services for a long [period], heretofore rendered to me, $500; to Mrs. May Harkey, $1,000; to W. F. Harkey, $500; to Dr. O. H. Clopton for medical services and attention, $300; to Duff

Following the testator's death in August, 1942, the executors filed their inventory showing real estate valued at $8,200 and personal property amounting to $4,167.42, inclusive of a $500 note, $91.42 in bank deposit, and $2,100 postal savings. An appraisement reduced estimated value of the real property by $600, and the personal property by $384.

After appraisal, Rittenhouse took possession of a part of the personalty. Thereupon the executors petitioned probate court for an order citing Rittenhouse to show cause why he should not surrender the property. It was alleged to be worth $1,092, and included, in the main, household articles and appurtenances; also an automobile. There was an alternative prayer that Rittenhouse be charged with the appraised value of the withheld property. A second allegation was that Rittenhouse had possession of real property worth $1,000. It was sought by the petitioners (in event the court allowed Rittenhouse to retain possession of the realty) to have

Moore, $200; to O. D. Duncan, $500; to Vernon Duncan, $500; to Mrs. Florence Holifield, $300; to G. F. Mack for assisting in closing up my estate, $500; to O. T. Ward an additional $500 for assisting in closing up my estate.

[Fourth Section]: Should any of the above named persons be dead, or the institutions be out of existence at the time of my death, the part so bequeathed to them or any of them shall revert back to my estate, and be disposed of hereunder as otherwise provided for distribution of any surplus after said bequests are paid.

[Fifth Section]: I will that my dog, Ruffles, be kept after my death, in my home by my son, Herman Rittenhouse, if he will do so, and that the sum of $500 cash be set aside out of my money account for her care, to be used at the rate of $100 per year if found necessary; but if the dog shall die before the said sum is expended, the remainder to revert to my estate for distribution as herein otherwise provided.

[Sixth Section]: I have provided herein that my son shall have the net, annual income, payable monthly from the rents of my real estate and buildings, and no part of which shall be sold until his death, for the purpose of paying bequests, and if it is found that sufficient surplus money is on hand, not needed for expenses of administration, the same shall be prorated on the above bequests, the balance to be paid after the death of my said son, from the sale of my real estate.

[Seventh Section]: If for any reason my estate should not consist of sufficient amount of funds to pay all bequests herein made, then in that event the funds on hand shall be used to pay on said bequests, prorata. And if there should be a surplus after paying all of the bequests made, with costs of administration, and shall be allowed by the court, then such surplus shall be divided equally between the following: The two Methodist Churches in Rector; the Rector Ladies' Club; the Rector Public Library, [and] the Rector Public Schools.

the rental value declared, to the end that the executors might take credit on monthly remittances to the respondent as contemplated in the second section of the will.

The court held it did not have power to authorize Rittenhouse to keep the personal property and be charged with its equivalent in money. A monthly allowance of $20 was made in Rittenhouse's behalf. The executors complied with the order for payment, but filed suit in replevin for the personalty. The action is pending in circuit court.

In October Rittenhouse petitioned probate court to direct the executors to make larger payments, contention being that they had more than $600 on hand; that unsold cotton and corn were worth in excess of $550, and that a business house in Rector brought monthly rental of $28, "making an annual income in excess of $1,486." On this petition the court found that Rittenhouse, as the only heir of Lottie Earle, was entitled to all rents and profits flowing from the estate. Furthermore, that he was entitled to possession, custody, and control, and to take and hold it, manage it, and receive all proceeds except such sums as might be necessary to pay taxes and insurance. The executors were ordered to pay Rittenhouse all money they held except what was necessary to complete payment of 1942 taxes. They were enjoined from disturbing Rittenhouse in his possession.

To sustain the judgment appellee insists that the will vests a fee title in him. Appellants think a trust in the executors was created and that probate court was without jurisdiction. They cite *Frank* v. *Frank*, 88 Ark. 1, 113 S. W. 640, 19 L. R. A., N. S., 176; *Williamson* v. *Grider*, 97 Ark. 588, 113 S. W. 361. Appellee believes the case is controlled by *Wallace* v. *Wallace*, 179 Ark. 30, 13 S. W. 2d 810.

In the Wallace case section four of the will was: "It is my desire and I do hereby will that my two plantations situated in Howard County, Arkansas, and known as the McDaniel and Block farm, be held intact and in trust for my legal heirs for the term of twenty-five years

after my death.. The manager or superintendent of said farm is to use my office or residence in Saratoga, Arkansas, as a residence or business office, the net proceeds of the rental of said farm to go to my legal heirs each year. After the twenty-five years have expired, said lands may be sold or divided for the benefit of my said heirs.''

W. P. Wallace, a brother of the testator, conveyed his land interest. His son brought suit to have the will construed, alleging he was entitled to one-sixth of the sale price of lands mentioned in the paragraph we have quoted. In the alternative, he asked that the McDaniel and Block farms be held intact and in trust for twenty-five years for the benefit of those who should at the expiration of that time be heirs of his uncle.

The two questions discussed in the appeal from a decree sustaining a demurrer to the complaint were: (1) Did the appellant have a right to maintain the action? (2) Did paragraph four create an enforcible trust that could not be terminated until twenty-five years had expired? The appellant contended he was a contingent remainderman, and [under the rule of cases cited at pages 33 and 34 of the opinion] entitled to maintain the action.

Our decision refers to statements appearing in Tiedeman on Real Property, and to other authorities. It quotes the recognized rule that ''a remainder is a residue of an estate in land, depending upon a particular estate, and created together with the same.'' ''The testator,'' says the opinion, ''desired that his farms be held intact, and he merely expressed a wish that his heirs might see proper to do so.''

The gist of the decision, as it affects the instant controversy, is expressed in the succeeding sentence:— ''Of course, equity would not permit a trust to fail for want of a trustee, *but here no* trust has been created.''

It was then held that the language of section four did not create a remainder either vested or contingent; that the words ''it is my desire and I do hereby will'' were synonymous with ''desire and wish''; hence, preca-

tory. Result was influenced by failure of the testator to name a trustee, although the executor was given power to appoint an overseer, or a manager.

*Black* v. *Bailey,* 142 Ark. 201, 218 S. W. 210, was cited as a case holding that a will which provides that a named trustee should hold the property "with full power and authority to handle, manage, and control [the estate as in the judgment of the trustee may seem best]" for use and benefit of the testator's children, did not vest legal title in the trustee. After commenting that in the Black-Bailey decision it was held that beneficiaries might terminate the trust, the Wallace opinion says: "So here all the legal heirs are *sui juris.* The appellees are the sole legal heirs interested in the litigation, . . . and with their consent the property may be sold and a good title conveyed by them."

That brothers and sisters of the testator, "living at the time of his death," together with Mrs. Sallie Wallace, should take the fee to the two farms, was held to have been the *intent* of Josiah H. Wallace when he made the will. A reference in *Williams* v. *Norton,* 126 Ark. 503, 191 S. W. 34, is to decisions of Virginia and Georgia to the effect that "an heir can be disinherited only by express devise or necessary implication, so strong that a contrary intention cannot be supposed; . . . the heir cannot be disinherited unless the estate is given to somebody else."

Tested by the foregoing rules, what were the *intentions* of Lottie Earle?

In the first paragraph of the will (not set out in the footnote) she expressed a desire that funeral expenses of Herman Rittenhouse "be paid out of my estate, if his estate is not sufficient to pay such expenses, and if my estate will afford such expense." This desire—granting that a mere *wish* is expressed and that the words are precatory—is nevertheless clearly indicative of a realization that the son might die without sufficient assets to meet burial requirements, and in that event, her property—assets in the hands of executors—is to be used to

meet the emergency. If the purpose had been to vest the estate at once, other language would have been used.

The second paragraph bequeaths to Herman annual income from rents "of *my* [2] real estate and business houses."

Other bequests (section two) are to designate persons and institutions. These, with the provisions of sections five and six, aggregate $6,700.

Again, construing her own will, the testatrix says (section six) : "I have provided herein that my son shall have the net, annual income, payable monthly from the rents *of my real estate and buildings.*" To protect Herman, even at the expense or inconvenience of those who stand to profit by express bequests, the donor added, ". . . and no part of which shall be sold until his death, for the purpose of paying bequests." But if it should be found that sufficient surplus money "is on hand, not needed for expense of administration, the same shall be prorated [on bequests], the balance to be paid after the death of my son, *from the sale of my real estate.*"

The seventh section provides that if "for any reason, "my estate" is not sufficient to pay bequests, "then in that event the funds on hand shall be used to pay on said bequests prorata." [3]

From the Wallace case we deduce that an heir may be disinherited if the testator's implication is so strong as to show that intention, and if the estate is otherwise disposed of.

Here bequests are explicitly made, payable from the testator's real estate—from property not to be sold for that purpose, however, until the son dies. Herman is limited to the income, payable monthly. "Funds on hand" were directed to be paid prorata on the bequests.

To be paid by whom? By the executors, of course ; by the representatives whom Lottie Earle selected as the repositors of her estate, to be held in trust for the

---

[2] All italics supplied.

[3] It was directed that any surplus should go to other legatees.

ends so clearly set out. Hence, the real property vested in such trustees, with life benefits to Herman.

We hold, therefore, that as to household effects of a miscellaneous nature not reasonably required to operate the farm, (no mention of these having been made in the will) Herman took as next of kin. As to cash assets not needed to successfully conduct farming operations, they are to be paid prorata on bequests after a reserve has been set aside to meet requirements of paragraph five. Earnings of the real property, less taxes and insurance, should go to Herman, payable monthly. Upon Herman's death, if his estate is not sufficient to meet burial expenses, then such cost is payable by the trustees, in preference to bequests. Thereafter the bequests, or balances thereon, are to be paid.

Reversed and remanded with directions to proceed in a manner not inconsistent with this opinion.